C. P. SEILERT v. WILLIAM F. McANALLY and J. W. WHITE, Guardian and Curator of JOHN and CURTIS McANALLY; J. W. WHITE, Appellant.

### Division One, November 27, 1909.

1. **TITLE TO REAL ESTATE: In Minor: Suit Against Guardian.** The title to both personal and real property belonging to a minor (absent an express trust) is in the minor, and not in the minor's guardian and curator, and hence the ward's title to either cannot be disturbed without he is made a party to the suit, is duly summoned and have his day in court. A suit, summons and judgment against the guardian and curator alone do not bind the minor. The duty of the guardian and curator is to defend the title of his wards when they are made parties and summoned by due process.

2. **HOMESTEAD: Fraudulent Conveyance: Burden.** Where the land in controversy was once a homestead, the burden is on him who claims it was conveyed by the homesteader to defraud creditors, to show that it ceased to be a homestead before the conveyance was made; and until he successfully carry that burden, he cannot be heard to contend that it was conveyed to defraud creditors.

3. ———: ———: **Title.** The land was a homestead and the title was in the husband and he conveyed to his father, who in turn conveyed to the homesteader's wife, both deeds being made without actual consideration, though one was expressed, and both being recorded. The wife died leaving minor children, and the husband sold to plaintiff, whose abstract furnished by the husband did not show the deeds to his father and wife, and plaintiff knew nothing of them. The husband represented to plaintiff he had good title, and testified the conveyances were made to avoid the payment of a debt which he owed a machine company. *Held*, the land being a homestead, there could be no fraud in the conveyance, and the plaintiff is not entitled, in this suit to quiet title, to have the title divested out of the deceased wife's minor children, and vested in him.

4. ——: ——: ——: **Possession: Curtesy.** Nor does the fact that the wife during the time she lived did not take possession change the result, nor that the husband after her death continued in possession up to the time plaintiff bought from him, since the husband was under his curtesy right entitled to possession.

5. **FRAUDULENT CONVEYANCE: Recorded Deed: Notice: Ignorance.** There is no exception to the statutory declaration that the record of a deed imparts notice to all subsequent purchasers of its existence. If that record shows the grantor had through an intermediary conveyed the land to his wife, the purchaser cannot avoid that deed, and divest the title out of her children after her death intestate, by showing that he was ignorant and could not read, and that the abstract furnished him by the grantor did not show such a deed.

6. ——: ——: **Grantee a Privy.** To avoid a voluntary recorded conveyance to a wife, on the ground that "the grantee was a party or privy to the fraud intended," it must be shown that the wife was a party to the fraud on the subsequent purchaser, and not that the sole purpose was to defeat a specific creditor of the husband. The deceased wife cannot be held to be a party to the fraud of an abstracter whose subsequent abstract did not show the conveyance, and who omitted it from his abstract when the surviving husband undertook to sell the land to a subsequent purchaser.

7. **HARD CASES.** Hard cases should not be permitted to make bad law. The symmetry of the law should not be spoilt, nor the statutes whittled away, to give relief in one hard case.

Appeal from Stoddard Circuit Court.—*Hon. J. L. Fort,* Judge.

REVERSED AND REMANDED (*with directions*).

*Houck & Houck* for appellant.

There is no evidence upon which to base a judgment for respondent. The evidence in this case shows that the contested deeds were executed two years before the sale to plaintiff for the purpose of preventing the premises in question from being sold for Wm. F. McAnally's debts, and that within six weeks of their execution the grantee, Martha Isabel McAnally, died.

The only question there can be under such proof is, whether a subsequent purchaser can have conveyances avoided because such conveyances were executed with the intent to defraud existing creditors. The Supreme Court of this State has answered this question a number of times and since the decision in case of Bonney v. Taylor, 90 Mo. 63, has held uniformly that he cannot. The grounds upon which conveyances may be avoided for fraud are clearly set out in Secs. 3398 and 3399, R. S. 1899. Reynolds v. Faust, 179 Mo. 28; Davidson v. Dockery, 179 Mo. 697. Not only is there no proof that there was any design to defraud subsequent purchasers at the time of the execution of the deeds in question in the case at bar, but there is no proof that Martha Isabel McAnally or her children ever had such an intent or even had the slightest idea that such deeds would or could be used for such a purpose. Nor could they have been so used without the concomitant carelessness or connivance of the abstracter, as both deeds were of record long before respondent's purchase.

*Ralph Wammack* for respondent.

(1) The law presumes such conveyances to be voluntary, and no actual fraud on the wife's part need be shown. Patton v. Bragg, 113 Mo. 595. The court from the record alone was justified in finding that these deeds were voluntary conveyances, and executed for a fraudulent purpose, and if that were sufficient, under the adjudicated cases in this State, upon which to base a decree for plaintiff in this case, the judgment of the trial court could easily be sustained. St. Francois Mill Co. v. Sugg, 206 Mo. 155. He who accepts and profits by the fruits of a fraud is no better than the perpetrator thereof. (2) The most difficult problem that confronts the respondent in this case, is the fact that the courts of this State hold that before a fraudulent deed, which has been placed of record, can be set aside at the suit of a subsequent purchaser,

he must allege and prove that the deeds were executed with the intent to defraud such purchaser, and that the grantee was privy to such intended fraud. This rule of law, if adhered to, puts upon the plaintiff an almost insurmountable burden. In England and in Canada the courts hold that all voluntary conveyances in consideration merely of love and affection, or a sense of moral duty, are *ipso facto* fraudulent and void as against subsequent purchasers for value with or without notice of the prior voluntary conveyance, and in some of the United States the English rule has been followed. It is said, "that the prevailing and sounder American doctrine is, that, a person purchasing property with full knowledge of a previous voluntary or fraudulent conveyance by his grantor cannot maintain an action to set such conveyance aside. In several jurisdictions a distinction is drawn between a voluntary conveyance made in good faith and a conveyance made with fraudulent intent, holding that the latter may be avoided by subsequent bona-fide purchasers, even where they have notice of the previous conveyance, while in the former case purchasers with notice cannot attack the conveyance. In some jurisdictions it is held that constructive notice is sufficient to bar a subsequent purchaser's right of action to set aside a fraudulent conveyance, while in other jurisdictions it is held that the notice must be actual and that constructive notice is not sufficient." 20 Cyc., p. 438.

LAMM, P. J.—Plaintiff sues in equity to set aside two certain deeds to Stoddard county land, as a cloud on his title, and to vest title out of defendants and into him. Defendant, William F. McAnally, does not appeal. A decree going, the defendant guardian and curator appeals.

Summarized, the bill alleges that on the 23d day of July, 1897, said Wm. F. was seized in fee of the southeast quarter of the northwest quarter and the

southwest quarter of the northeast quarter, section 25, township 26, range 10 (80 acres); that on said day he and his then wife, Martha Isabell, conveyed the land to one Alex. McAnally for an alleged consideration of $1,500, the deed put of record presently; that three days later Alex. reconveyed the land to Martha Isabell for a like alleged consideration, which deed was put of record on the same day as the other; that on the 16th of September, 1899, over two years later, Wm. F. and his then wife, Alice (Martha Isabell having died intestate), sold the land to plaintiff, conveying it by warranty deed for full value paid, putting plaintiff in possession; that being unlettered, unfamiliar with land titles or how to trace them, plaintiff had to depend on others; that he intended to buy an unincumbered fee simple title and to that end used reasonable diligence and caution by requiring said McAnally to furnish him an abstract of title; that such abstract was furnished showing perfect fee simple title in him; that relying on and induced by said abstract, and by the fraudulent representation of Wm. F., *viz.*, that he had a fee simple title, plaintiff purchased the land, paid his money and took a conveyance and possession; that in truth and fact the title was defective not only in respect to said two conveyances but in respect to other matters (immaterial here); that later, to-wit, in January, 1905, Wm. F. McAnally notified plaintiff that he did not own the land at the time he conveyed to plaintiff, but had theretofore conveyed to Martha Isabell, and that "they had better fix up the title . . . while they were both alive;" that plaintiff then caused the records to be searched and found the two 1897 deeds; that said abstract of title failed to show either of them; that "said deeds were falsely and fraudulently executed by the parties thereto with intent to cheat and defraud prior and subsequent creditors and probable purchasers of said land; that they were voluntary conveyances and were made without any con-

sideration, and that no change of possession was ever had thereunder;'' that the heirs of Martha Isabell are William F. (her husband) and John and Curtis, her minor children; that defendant White is the duly appointed, qualified and acting guardian and curator of said minors; that though often requested to do so, defendants ''have failed and neglected to perfect his title to said land;'' and that said deeds ''constitute a cloud on plaintiff's title. Wherefore,'' etc.

The answer was a general denial by the guardian and curator in his own behalf and for said minors. Defendant McAnally defaulted.

Plaintiff, to sustain the averments of his bill, put in proof as follows: (1st) A warranty deed to him from W. F. and Alice, his second wife, of date September 16, 1899, consideration $800; (2d) A warranty deed in regular form by W. F. and Martha Isabell, his first wife, to Alexander McAnally—consideration, date and record as alleged in the petition; (3d) A warranty deed from Alexander to Martha Isabell and recorded the same day as number two.

Supplementing his documentary proof, plaintiff took the stand and testified that he bought the land on the 16th day of September, 1899, now lives on it as a home, knew McAnally for some time, always considered him a man of his word and honorable, knew he had lived on it several years and had rented it out, collecting the rent when not living on it. McAnally came to him and offered to sell; told McAnally he might trade if he had a good title; McAnally said he had a good, straight title—''not a flaw in it;'' plaintiff said to him he ''was ignorant and did not know a thing about land titles.'' McAnally replied he would fix that matter by getting an abstract. Plaintiff told him to do so, he would have it examined and would take the land if the title was all right. McAnally got an abstract showing the title all right. (Note: This abstract omitted the 1897 deeds and certified the title clear.)

Thereupon the deed was made and plaintiff paid $800. Plaintiff firmly believed at the time that McAnally had a good title, would not have traded if he had doubted it. Plaintiff knew nothing about McAnally's deed to Alexander and Alexander's to Martha Isabell and never heard of them till years afterwards. McAnally was reputed to be the owner of the land—had paid taxes, lived on it or rented it just like an owner. Plaintiff bought the place for a home and since purchasing had built a barn and fences and had otherwise improved the place—never having been disturbed in his possession or enjoyment of it. In 1905 plaintiff got a letter from McAnally telling him that he had deeded the land to his first wife before she died. Put on inquiry, plaintiff then searched the record and found deeds putting title in Martha Isabell. He then went to Alexander McAnally (Wm. F.'s father, now dead), and on inquiry was told that he (Alexander) paid nothing for his deed, and got nothing on Martha Isabell's. Plaintiff had no schooling, could neither read nor write. The land in question is all he has. William F. McAnally told plaintiff he conveyed to Isabell to keep Mr. Houck, an attorney, from enforcing the collection of some machine notes he held against him and one Miller, and that there was no consideration for the conveyance.

On cross-examination plaintiff admitted that neither William F. nor Martha Isabell was ever indebted to him in aught, and that he had had no dealings with Wm. F. except as detailed in his direct examination.

To further sustain his bill, plaintiff offered the deposition of defendant, William F. McAnally. In substance his testimony follows: Witness sold the land to C. P. Seilert; bought it from one Hunt; owned it seven or eight years; used his own money in paying for it; his first wife, Martha Isabell, resided on the land; witness was living on it when he sold it to Sei-

lert. Asked under what circumstances the conveyances were made to Alexander and Martha Isabell, he answered that he owed a debt to a machine company for a binder bought by him and one Miller—they giving joint notes. These came into the hands of Mr. Houck for collection. Witness was about to sell the place he was then on and move on the land in controversy, so he sold his interest in the machine to Miller who was to take up the notes. Afterwards Houck wrote witness that he held a note over due. Witness told Houck that Miller was to pay—he must look to him. Houck promised to look to Miller. Witness then went to Dunklin county. While there Houck wrote him threatening to sue if the note was not paid and to sell the land. The letter said it could not be held any longer as a homestead. At that time Martha Isabell was in bad health and nervous. She insisted witness should transfer the land to her to save it from being sold. Witness consented to do it. A deed was made and acknowledged and his wife came to Stoddard county and had "the changes made." No money passed from witness's father, Alexander, to him, or from Martha Isabell to Alexander. The only object of the transfer was to keep the property from being sold for the machine debt. Witness was allowed to say that it was not intended that the title was to pass for her use and benefit, but (quoting) "she was just to hold it for me." Nothing was ever said, however, about her deeding it back. The possession never passed out of witness under the deeds in question, but when those deeds were made witness and his wife were not living on the land. Witness collected the rent after the conveyances. Martha Isabell, after the deed to her (quoting), "made no claim of ownership to these lands." They were always assessed in witness's name and the rent notes ran that way. Martha Isabell died about six weeks after she got title. Witness narrated at length how Martha Isabell got $200 as a

present from her father, which he (witness) put into a piece of land and took title to himself. Sale was made and the purchase money used to buy other land, witness taking title. This was about thirteen years before he bought the Hunt land. His wife made no claim to any interest in any of the lands and witness could not say he used his wife's money in buying the Hunt land. The conveyance to her was not on account of the advancement made by her father about twenty-one years ago. Witness had four children by his first wife—two now living, John and Curtis. One died after Martha Isabell. He stated his reason for not telling Mr. Seilert that he had conveyed the property to his wife to be that he had "no notice of this other conveyance except what my wife had told me." Witness said he did not know the deeds were recorded. He knew about making one deed but not the other, and, not knowing they were recorded, did not tell Seilert. He intended to convey him a clear title. His wife told him the deeds had been made and recorded and that is what made him write Seilert that if they were on record he, witness, "wanted to fix it." Witness was "positive" there was an agreement between them that she take the land and hold it to prevent its sale for the machine debt.

On cross-examination he stated that the $200 received by his wife from her father was put into land which was sold and the proceeds reinvested in other land and so on down until the Hunt land was bought. Witness and Martha Isabell lived together as husband and wife until she died, never was sued on the machine note, denied knowing that Miller had paid it before his wife got title to the land, knew nothing in regard to it except from Houck's letter, and the transfer was on its heels.

The guardian and curator, on behalf of his wards,

introduced no testimony. Such is the case on the facts.

At the close of plaintiff's testimony, an unsuccessful demurrer was interposed, and exception saved.

The decree narrates that the case was heard on the petition and on the "answer of J. W. White as guardian and curator of John and Curtis McAnally, minor defendants;" that defendant William F. made default; that plaintiff and the guardian and curator came in person and by counsel. The issues were found for plaintiff, the assailed conveyances were found to be falsely and fraudulently executed by the parties thereto "with intent to cheat and defraud prior and subsequent creditors and probable purchasers of said land," voluntary, etc., and that no change of possession followed them. After other recitations relating to plaintiff's purchase in good faith on full consideration paid for a fee simple title with no "actual knowledge" of said conveyances, etc., it was adjudged and decreed that the deeds (describing them) be cancelled and held for naught and that the legal title to the real estate (describing it) "be divested out of *defendants* and fully vested and confirmed in the plaintiff," and that plaintiff have his costs and execution therefor.

On such record can the decree stand? Clearly not, because:

(a)     The style of this case, the verbiage of pleadings, decree, and of the whole record indicate that John and Curtis were neither sued nor summoned as parties defendant. Defendant William F. had parted with his title, whatever it was, to plaintiff and had no interest left subject to a decree. That is, if he had a paramount title he had conveyed it to Seilert with covenants of warranty. Likewise, if he was tenant by the curtesy, as widower, then his life estate with the right to possession passed by his said warranty deed. Moreover, it cropped out in evidence that he had four children by Martha Isabell, three of them alive at the

time of her death, one died since. We assume one died before. Now, the petition does not count on the theory that W. F. inherited an undivided interest from the child dying after its mother, but on the theory that the mother had no title in equity. If William F. inherited an interest as one of the heirs of his deceased child and if descent was cast on him before he made his deed to plaintiff then that interest, whatever aliquot part it was, passed by his deed to plaintiff. If such was cast on him after he made that deed then such after-acquired undivided interest inured to the benefit of plaintiff under his prior warranty. But there is nothing of this sort in the bill. Its theory is that the mother died seized of a legal title in the land; that such title descended to her children, John and Curtis; that her title was fraudulent; hence the title of John and Curtis as privies in estate was tainted, wherefore plaintiff sought to clear up his own title by removing the cloud of the minors' tainted title. In that view of the case why Wm. F. was made a party is not clear to me.

It is primer law that the title to personal property of one dying intestate passes to his administrator— if he die testate, then to his executor or administrator *cum testamento annexo*—but the title to real estate vests directly in the heir. So, the title to personal property belonging to the ward (absent an express trust) is not vested in his guardian and curator, as a matter of law, but in the ward. Accordingly, the ward's title to either his real or personal estate cannot be disturbed without his being a party to the suit duly summoned and having his day in court. He cannot be sued and bound vicariously by haling into court his guardian and curator. [R. S. 1899, sec. 558; Webb v. Hayden, 166 Mo. l. c. 50; Judson v. Walker, 155 Mo. l. c. 179; Payne v. Masek, 114 Mo. l. c. 636—a case taking color from the peculiar wording of the partition act.] Mr. White as guardian and curator had no

title to the real estate of his wards. His duty was to defend their title when they were summoned by due process in a suit relating to it. It is not clear, therefore, to us why he was made a party defendant.

These preliminary observations are made in order there may be no misconception about the proper parties defendant in a real estate action, or mischief rush in through the open door of a bad precedent. A judgment vesting the title of infant heirs out of them and into another (as does this) without their being sued and summoned, has no legal foot to stand on and would be brushed away on appeal. However, there is bare chance that, present obscurities, we do not understand the record. It may be that under an unhappy title of the case, and despite unhappy record language, John and Curtis were actually summoned and their guardian and curator answered for them. Extending grace to plaintiff by throwing that doubt in the scale, we shall dispose of the merits. .

(b)    Under this record the land in controversy was once the homestead of William F. and Martha Isabell. That status is presumed to continue until the contrary appears. The burden, then, was on the plaintiff to show it ceased to exist, and until he successfully carried that burden the McAnally title could not be fraudulently dealt with by them. Such has been the law in this State since Vogler v. Montgomery, 54 Mo. 577. The homestead is forbidden fruit to the creditor. He may not take it or eat thereof. Wherefore, as to the world at large, the homesteader (absent a statutory prohibition) may convey his homestead at his own sweet will, fraud or no fraud. This because, as said by Lord HALSBURY in Derry v. Peek, 14 App. Cas. l. c. 343 (quoting language his lordship said was some centuries old): "Fraud without damage or damage without fraud" does not give rise to actions for fraud. There are exceptions to this rule, notably

when parties deal with each other in a fiduciary rela-
tion. But the case at bar is not within any exception.
There is no testimony that the McAnallys had aban-
doned their homestead in Stoddard. It is true they
lived a little while in Dunklin, but nothing shows they
intended to remain there permanently, or that the in-
tention to return (the *animus revertendi*) did not
exist. We find they came back presently. True, too,
Mr. Houck wrote McAnally that he had lost his home-
stead. But may a decree stand on that letter? The
learned attorney doubtless had the crowning virtues
of a good lawyer, *viz.*, diligence, tact, learning, in-
tegrity, yet the aim of the letter was merely to press
a spur into the side of a balking debtor, not to estab-
lish a proposition of law and fact. Observe, he did
not pass on the issue of homestead or no homestead
as a judge in a court of justice, or as an arbitrator
or referee in a rustic tribunal and decide the question,
*rusticum judicium,* so to speak; *ergo,* his proclama-
tion that the homestead was lost did not operate as
an estoppel of record, or *in pais,* binding on all men,
courts included.

We conclude the judgment should be reversed on
the ground (if no other) that there was no proof such
as would vitiate the conveyances of the homestead.
The fact that they were voluntary amounts to noth-
ing, nor does the fact that Martha Isabell, during the
six weeks she lived, took no possession and that Mc-
Anally continued in possession up to the sale amount
to anything. He was entitled to possession under his
curtesy.

(c) Section 3399, Revised Statutes 1899 (in the
chapter on Fraudulent Conveyances) reads: "No such
conveyance or charge shall be deemed void, *in favor
of a subsequent purchaser,* if the deed or conveyance
shall have been duly acknowledged or proved and re-
corded, or the purchaser have actual notice thereof
at the time of the payment of the purchase money,

unless it shall appear that the grantee in such conveyance, or person to be benefited by such charge, was party or privy *to the fraud intended.*"

The foregoing section is also an insurmountable barrier to plaintiff's recovery. This because:

(1) The deeds sought to be vacated were on record for two years before plaintiff took his own conveyance. Now, section 923, Revised Statutes 1899, requires instruments in writing conveying or affecting real estate to be recorded in the county where such real estate is situate.

The next section reads: "Every such instrument in writing, certified and recorded in the manner hereinbefore prescribed, shall, from the time of filing the same with the recorder for record, impart notice to all persons of the contents thereof *and all subsequent purchasers and mortgagees shall be deemed, in law and equity, to purchase with notice.*"

In the face of that section it is a vain thing for plaintiff to say (as he does) that he had no "actual notice" of these conveyances. He was bound to take notice. The statute makes no exception in favor of a blind man, or an unlettered man, or infant, or married woman, or any other person who may be an object of anxious care to a court of chancery; and it would be audacious for us to write in an exception. That the due and timely record of a properly acknowledged deed conveying real estate is conclusive notice to the whole world of its contents, is a property rule in this State not to be trifled with or whittled away by judicial construction. Those who walk as well as those who run must be held to read the record of a deed. It is one case in which those who cannot read must read, and where all are presumed to be well read.

(2) The exception under section 3399, *supra,* whereby a conveyance of the character in hand may be deemed void as to subsequent purchasers is where

the grantee "was party or privy to *the fraud intend-
ed.*" In this case, conceding for present purposes
that fraud was intended, yet it was a fraud against
a specified creditor. Plaintiff defined, ear-marked and
circumscribed the fraud by the evidence of McAnally
and showed it alone aimed at the machine company, a
creditor, and not at subsequent purchasers or, to use
the language of the petition, "probable purchasers."
The idea was to save the home to themselves and it
would not do to say they had purchasers in mind.
Furthermore, it matters not what McAnally had in
mind, the controlling question is what Martha Isabell
had in mind. [Davidson v. Dockery, 179 Mo. l. c. 697,
and cases cited.] We doubt not from this record that
the afflicted wife of McAnally had no purpose to wrong
innocent purchasers of the land and never contem-
plated that her husband, after her death, would con-
spire with a scampish or slovenly abstracter to con-
coct a lying abstract and wrong a purchaser in that
way. If it were ruled that such covinous or reckless
performance wiped out the notice given by the deed
record, under express statutory mandate, no vendee
who held title by a voluntary conveyance as a gift
would be safe in his estate so long as a subsequent
purchaser from his donor could show that he was im-
posed upon by an inefficient, insolvent or rascally ab-
stracter.

(d) It is insisted that McAnally was not a com-
petent witness to overturn the deeds in question. Up
to this time we have treated his testimony as com-
petent. McAnally's confession is all the evidence on
the point and appellant timely and aptly objected to
its introduction, without avail. In my opinion he was
clearly incompetent to reveal confidential conversa-
tions with his wife or overturn his own grant. But
the question is not necessary to a decision of the case
and is, therefore, reserved.

The case in some of its features is a hard one,

but plaintiff's possessory rights during the life of William F. McAnally do not, at first blush, seem to be in jeopardy, and if his warranty deed conveyed any interest cast on McAnally by inheritance from one of his children, then (as already said) plaintiff may be a tenant in common with John and Curtis.   If so his betterments are not likely to be in jeopardy, and may be protected whenever partition will lie.   However hard the case, we may not spoil the symmetry of the law or give relief to plaintiff at the expense of the minor heirs of Martha Isabell, who did plaintiff no wrong.  Says Lord CAMPBELL (East India Co. v. Paul, 7 Moore P. C. 111): "It is the duty of all courts of justice to take care, for the general good of the community, that hard cases do not make bad law."

The judgment is reversed and the cause remanded with directions to dismiss plaintiff's bill as on a hearing on the merits, and render judgment against him for costs.   All concur.