COVINGTON et al. v. CHAMBLIN et al., Appellants.

Division One, June 12, 1900.

1. **Judgment of Probate Court:** COLLATERAL ATTACK. The judgment of a probate court erroneously allowing claims against an estate and directing the sale of real estate to pay the same, is a final judgment and can not be collaterally attacked, but is subject to impeachment only in a direct proceeding for that purpose on two grounds only, namely, lack of jurisdiction, or fraud in procuring it.

2. ————: LACK OF JURISDICTION. To impugn a final judgment on the ground that the court was without jurisdiction to render it, the lack of jurisdiction must appear from the defects on the face of the record of the court rendering the judgment.

3. ————: ERRONEOUS ALLOWANCE: ORDER OF SALE OF REAL ESTATE. All errors made in the allowance of demands against an estate and in an order directing the sale of real estate to pay such allowances, are merged in the judgments therefor, and are no longer subject to judicial inquiry except so far as such inquiry may be necessary to show that the judgment itself was procured by fraud. A court of equity will not vacate a judgment simply because the claim or demand on which it was based was fraudulent or not due, but only because fraud was practiced on the court in procuring it.

Appeal from Pemiscot Circuit Court.—*Hon. Henry C. Riley,* Judge.

REVERSED.

*R. B. Oliver* for appellants.

(1)   The order or judgment of the probate court finding that such a claim was a demand and charge against Covington's estate is not void.   Brown v. Woody, 64 Mo. 547; Rogers v. Johnson, 125 Mo. 212; Camden v. Plain, 91 Mo. 129; Marcey v. Stark, 116 Mo. 481; Sherwood v. Baker, 105 Mo. 472.   (2)   Not a single one of the material allega-

tions in the petition has been proven by direct or positive testimony; and there are no legal presumptions flowing from the testimony offered that would warrant a chancellor to infer any fraud on the part of Chamblin, or of the administrator, or that would warrant the findings recited in this decree. Long v. The Joplin Mining & Smelting Co., 68 Mo. 422; Agan v. Shannon, 103 Mo. 661; Lenox v. Harrison, 88 Mo. 491; Sherwood v. Baker, 105 Mo. 472; State v. Bank, 120 Mo. 169.

*Wilson Cramer* for respondents.

(1) The list of demands kept by the administrator shows that all of the claims specified therein, excepting one, were allowed and classed prior to June 15, 1875, i. e. within three years after the grant of letters. (2) The allowance of $691.87 in favor of Turner Chamblin, for the payment of which the land in controversy was sold, is not embraced in this list, and is shown to have been made after Henry J. Wilks became probate judge in January, 1879. (3) The probate court had no authority to allow this claim in favor of Turner Chamblin, nor to order the sale of lands for its payment. The proceedings were *coram non judice* and void. (a) Because the claim was not exhibited to the administrator within two years, nor presented to the probate court for allowance within three years, after the first grant of letters. (b) Because it was not a debt existing at the time of Covington's death. 1 W. S. 1872, p. 102, sec. 2; Presbyt. Church v. McElhinney, 61 Mo. 540; Sauer v. Griffin, 67 Mo. 654; Teverbough v. Hawkins, 82 Mo. 180; State ex rel. Ziegenhein v. Tittmann, 103 Mo. 553; Beekman v. Richardson, 150 Mo. 430.

BRACE, P. J.—The plaintiffs are two of the three children of Philip T. Y. Covington, deceased. The de-

fendants are the heirs at law of Turner Chamblin, deceased.

This is a suit in equity to set aside a deed dated December 6, 1880, executed by G. W. Carleton as administrator of the said Covington, conveying the north half of the southwest quarter and the west half of the southeast quarter of section 10, township 17, range 11, in Pemiscot county, to the said Chamblin. The deed was executed in pursuance of a sale approved by the probate court of said county, made under an order of said court for the payment of the debts of the said Covington, deceased. The deed was in the usual form, duly executed, acknowledged and recorded. The substance of the cause of action set out in the petition, when stripped of its irrelevant and redundant matter, is: That the debts for the payment of which the land was sold were demands allowed by the probate court in favor of said Chamblin against the estate of the said Covington. That they were not legal demands against said estate in that they were for improvements upon the real estate of the deceased made after his death, were barred by the statute of limitations when allowed, and that their allowance and the order of sale of the real estate for their payment were procured by fraud. The answer was in substance a general denial. The trial court found the issues for the plaintiffs and rendered a decree annulling the deed, divesting the defendants of title to the real estate, vesting the same in plaintiffs, and awarding them a writ of restitution, with execution for costs, from which the defendants appeal.

Counsel for plaintiffs concede that the trial court committed many errors in its rulings upon the evidence, but as we will review the case upon the facts properly proven, the exceptions to those rulings need not be particularly noticed.

It appears from the legal evidence in the case, that in May, 1872, Philip T. Y. Covington died in Pemiscot county

intestate seized of the 160-acre tract in question, leaving him surviving, his widow and three children—the plaintiffs and their brother, W. A. Covington; that after his death, his widow intermarried with the said Turner Chamblin, and thereafter they remained in possession of the premises until the death of the said Chamblin. That prior to the death of the said Philip T. Y. Covington, he and his wife by deed dated January 20, 1871, conveyed one acre of the tract in question by metes and bounds to the said Turner Chamblin. That after his death his son, the said W. A. Covington, by deed dated March 4, 1874, conveyed all his interest in said land to the said Turner Chamblin. That soon after the death of the said Philip T. Y. Covington and prior to the 15th of June, 1872, letters of administration on his estate were granted by the probate court of said county to George W. Carleton, who duly qualified and entered upon the discharge of his duties as such. That in pursuance of a sale, under an order of the probate court for the payment of the debts of the deceased, the said administrator by deed dated October 6, 1874, conveyed certain lands other than those now in question, to the said Chamblin for the consideration of $825. That on the 6th of October, 1880, the said administrator executed and delivered the deed in question, in manner and form as hereinbefore stated. That on the 2d of December, 1882, the court house of Pemiscot county burned down, and the probate records of said county were destroyed by the fire. That the said Chamblin died about the year 1890, and his estate has since been administered and wound up. That in 1893, the said Carleton administrator, also departed this life. That afterwards, at some date prior to the 5th day of February, 1895, but on what day does not appear, this suit was instituted.

The evidence relied upon to support the judgment in this case is that of Henry J. Wilks, who became judge of

the probate court of Pemiscot county on the first of January, 1879, and who testified that shortly after he assumed the duties of the office:

"I was looking over the different estates that had failed to make a settlement, and making up an abstract to give the printer to notify the administrators that they were due settlements, etc., was what first called my attention to the Covington estate. It was the law then that all administrators had to make settlements, and the duty of the probate judge to publish the docket. That is what called my attention to the estate.

"Q. What time had elapsed from the time of the issuance of the letters up to this time that the estate had been under administration? A. I think five or six or perhaps seven years; I don't remember now.

"Q. Do you remember any claims being allowed subsequent to that time? A. No, sir; I can't name any claim that was allowed subsequent to that time.

"Q. After you were probate judge? A. Yes, sir; a claim or two was allowed.

"Q. For whom were those claims allowed? A. One claim I recall was a claim in favor of Turner Chamblin, who was then the step-husband to P. T. Y. Covington. In other words, he had married the widow . . . . . .

"Q. Do you remember, now, who it was that attended to having these allowances made against the estate? A. Which allowances do you mean?

"Q. The ones you had reference to? A. The Chamblin allowances?

"Q. Yes, sir? A. Major Carleton, the administrator, and Turner Chamblin. . . . . . . .

"Q. Is it a fact that as probate judge you ordered a sale, or made an order of sale, of this land in controversy? A. I did.

Covington v. Chamblin.

"Q. Now state if you afterwards became convinced that you had made an erroneous order of sale, and if you did, state how it came that you came to that conclusion? A. After making the order of sale of the lands described in this deed I became dissatisfied that I had made an order that perhaps I ought not to have made.

"Q. Why did you come to that conclusion? A. Why did I come to that conclusion?

"Q. Yes, sir? A. After making this order, some person, I don't know who, but I believe it was Sam Cross, told me that I ought not to have made that order, that he had defeated the order once prior to that in the probate court—to get the order of sale—and that it was wrong.

"Q. State your investigation of your records? A. That is what called my attention to it; then I examined the probate court records that had been made by my predecessor, John A. Gordon, and I found that I ought not to have made the order.

"Q. Let me have your attention a few moments? A. You have got it.

"Q. You say that while you were probate judge, you think during the first term of your office, you allowed a couple of claims against the Covington estate? A. I think I did; yes, sir.

"Q. Presented by Chamblin? A. Yes, sir; in connection with the administrator.

"Q. At the time these claims were allowed was there any evidence introduced before you showing the character of the indebtedness? A. Yes, sir; there was on oath, the evidence of the plaintiff, also the evidence of the administrator; he said they were correct and all right.

"Q. Said it was correct and all right? A. Yes, sir; Major Carleton.

"Q. Do you remember at this time what the charges were for? A. Yes, sir.

"Q. State, if you can, what they were? A. They were for work done on the realty belonging to the estate, and for expenses of the administration.

"Q. And for the expense of the administration? A. Yes, sir.

"Q. Those are the items included in the allowances? A. Yes, sir.

"Q. How long after that before the administrator, or whoever it was, came into court and asked for an order of sale, as near as you recollect? A. I don't remember how long it was. It was within two years—from the time I was elected and took my office up to the time of this sale—prior to that; I don't remember the date.

"Q. State who presented the application for the order of sale? A. The administrator, Geo. W. Carleton.

"Q. Who was present at that time? Was Turner Chamblin—to avoid delay? A. Turner Chamblin—

"Witness: I believe Turner Chamblin was here at the time it was allowed.

"Q. At the time the order was made for the sale of the land? A. I thought you said the allowance.

"Q. No, sir; at the time the order of sale was made? A. Yes, sir; I believe he was here then; I would not state positively.

"Q. State if the order of sale was made to pay off the allowances you have spoken about? A. Yes, sir.

"Q. Go back a moment to the allowance of this claim. You stated that it was for improvements on the real estate and for the expenses of the administrator. I will ask if you remember what part of the real estate was included in those charges? A. It seemed to be the home place.

"Q. The dower of the widow? A. Yes, sir; the dower

of the widow, and perhaps some fencing or something else. I believe for some building and blocking up or putting underpinning under some houses—a number of things. I don't remember the items.

"Q. You stated, in answer to Mr. Roberts, that after the order of sale had been obtained, you heard no evidence, no proof at the time the order of sale was made by you, did you? A. There was no person here, no, sir; I heard no proof.

"Q. It was just upon the representations of the administrator that you made the order? A. I did, thinking that he was the guardian of the estate, and that everything was all right.

"Q. You stated that after you had made the order you became convinced that you had made it wrongfully, or illegally? A. I thought I had, after Cross or some one else called my attention to what had transpired in the probate court prior to that.

"Q. State what had transpired in the probate court with reference to the sale of this land, prior to that time? A. When Cross, or whoever it was, told me that I had done wrong, that he had defeated the order for the sale of this land—then it was that I went back over the record to see what had been done.

"Q. What did you find upon the examination of the record? A. I saw where the same kind of an application had been made and had been refused by the probate court.

"Q. At what time; how long before that? A. Perhaps nearly two or three years; a long time.

"Q. How long had that estate been in course of administration when you made the order of sale? A. Some five or seven years. I don't remember now.

"Q. You say you examined the record of the order,

or at least in the proceeding where they undertook to get an order prior to the time you took possession of the office? A. Yes, sir.

"Q. Did the record set out the facts in the case? A. Yes, sir.

"Q. Can you detail any of them to the court? A. I don't know; Judge Gordon used to write his record rather prolix; it was rather a long order. I could not repeat the order verbatim; I can give the substance. It was that they presented their claims, and that the court found that the claims, for which they wanted to sell the lands, was for indebtedness accruing after the death of Covington, or the deceased, and the court refused to grant the order.

"Q. Did that order recite the fact that the finding of the court was that Chamblin was indebted to the estate, in place of the estate to him? A. I don't remember that it did.

"Q. To refresh your memory, I will ask you if the order, or decree, or the record showing the disposition of that proceeding by the probate judge, did not set out the fact that the claims for which the order of sale was sought— the land sought to be sold to pay them—was not for improvements on the homestead or the widow's dower; if the order did not say that? A. Yes, sir.

"Q. And for that reason the court refused to grant the order of sale? A. Yes, sir; and for debts accruing after his death. I don't remember now what all it was......

"Q. Then I understand you to say that it was upon the representations of the administrator and of Chamblin, made to you as probate judge at the time the claim was presented for allowance, and the utmost confidence that you had in Major Carleton, that induced you to allow that claim? A. Yes, sir.

"Q. And also to make the order of sale? A. Yes,

sir; I never thought anything about it when I made the order of sale. I thought it was all right.

"Q. After these claims were allowed and after the order of sale was made, you discovered your error? A. Yes, sir; I thought it was an error."

Cross-Examination.

"Q. State to the court what the items were—or, if you will undertake to state now after this length of time what the items of that account consisted of? A. Which account?

"Q. Any of them allowed against the estate of P. T. Y. Covington? A. The only account or allowance that bears upon my mind now is the allowance presented and allowed in favor of Turner Chamblin or Maj. Carleton; that was in my time. That is the only account I remember.

"Q. Will you undertake to state what the items of that account consist of? A. Only in a general way.

"Q. Please give them as near as you can? A. They were for repairing a dwelling house, prizing up the underpinning, corn or cribs, and repairing fences, and trimming out the old orchard.

"Q. Are there any other items that you remember? A. I remember the account. I know the place and the surroundings and it did need repairing badly.

"Q. State, as a matter of fact, if that betterment placed on that place was not by the order of the court directing the administrator to have those repairs made for the preservation of the estate? A. It appears to me like something like an order to repair the estate, or the administrator told me in the conversation I spoke of when I talked to him about the order of sale, that he had a right, or an order, I don't remember which now, to have the estate repaired, that it was right to have it repaired.

"Q. The administrator told you that? A. Yes, sir......

"Q. State if you know when it was those allowances which were had in favor of Chamblin were first presented to the probate court and notice waived by the administrator, if you know? A. I don't remember.

"Q. You have no recollection of the question? A. No, sir.

"Q. For all you know it may have been done within the first two years after Covington's death? A. No, I will not say that. No, it was not presented within two years.

"Q. I am asking when it was presented to the adminstrator, and notice on his part waived? A. I do not know......

"Q. Now about that order you found there, that Judge Gordon made; when did Judge Gordon make that order? A. It must have been about a year before I came into office.

"Q. Do you remember the term? A. No, sir; I do not.

"Q. Whether it was the spring or fall term, the first or last part of the year? A. No; I can not say now.

"Q. How long after you made the order of sale until Sam Cross or some one else told you you had made a mistake? A. Not a great while, perhaps one or two courts—three or six months. I would not say for certain it was Sam Cross, but some one.

"Q. State if it was before the sale was consummated, or afterwards? A. Afterwards, after the sale. That was the first trouble when the sale was made—first time my attention was called.

"Q. Was it immediately after the sale was made? A. Perhaps some months had elapsed after the sale.

"Q.   Before or after the approval of report of sale?
A.   I think it was after the report.   I know it was.

"Q.   State about how long after the approval of the
sale?   A.   It might have been three months.

"Q.   Three months after the order?   A.   After the
proof of sale I know if he had told me before I approved the
sale, I never should have approved it.   If my attention had
been called to this matter before I approved the sale I would
not have done it, I never would. . . . . . . .

"Q.   Do you know what part of that indebtedness ante-
dated the death of Covington?   A.   There was none of it,
none of it.

"Q.   How many debts were there unpaid when you
made this order of allowances?   A.   I don't think there
were many debts.

"Q.   How many?   A.   $300 allowance to Chamblin;
I remember $300 and then $200 or $210, perhaps, and $100
and something—three different items I remember—no, two
items, and then the expense of the administration so much,
and then the administrator had a list to show what the ex-
pense consisted of, which amounted to about $600.

"Q.   How many different evidences of debt were there,
two, three or more?   A.   I will say three.

"Q.   You undertake to state now, fifteen years after
that time, the number of items in this account, do you, and
the amount?   A.   I will not state the number definitely; I
believe it was three.

"Q.   You undertake to state who were the owners of
them, and the items constituting them?   A.   Yes, sir.

"Q.   What was the first one?   A.   I think if I am
not mistaken, $300, to Turner Chamblin; the second one on
the list was to Turner Chamblin, and the third one was for
the expense of the administration, the administrator, myself,
the sheriff and others.

"Q. State if you don't know upon reflection that you are mistaken about that? A. No, sir; I do not......

"Q. The only reason you think you made a mistake was the fact that Sam Cross, you think—though you are not certain it was he—told you you had made a mistake in this matter? A. Is that the question?

"Q. Yes, sir. A. No, sir; that is not all the reason.

"Q. What other reason had you for believing you made a mistake? A. I looked and saw for myself the records. I thought at that time I was a pretty good probate lawyer, and I found out I did not know anything about it; at least that I had done something that I would not have done with the lights before me properly......

"Q. I understand you give as another reason why you made a mistake because Judge Gordon, your predecessor, had refused to make an order of sale of this land, and that those two reasons constituted the basis of your judgment now that you had made a mistake? A. I will not say what my judgment is now.

"Q. It was the order you found made there by Judge Gordon declining the order of sale for this property, together with what this somebody told you, that led you to believe that you had made a mistake in ordering the sale yourself; is that right or not? A. I said awhile ago the first intimation I had of anything wrong being committed by me as an officer was by Mr. Sam Cross, or some one else, telling me that Judge Gordon did not do it that way, or that Judge Gordon refused this order of sale. Then it was that I went to the probate records and examined to see what Judge Gordon had done, and I found there that he had refused the order of sale of this land which I had ordered to be sold as probate judge. It was not what Cross or any one else led me to believe that I had done wrong, but what I had found."

Much of this evidence was admitted over the objections of the defendants, and to rebut it they introduced an extract from a deposition of Major Carleton in another suit, and a book of the deceased administrator, in which was a list of demands allowed against the estate of Covington, and memo. of his inventory and of four settlements, and other memo. tending to show that other demands than those of Chamblin remained unpaid at the time the order of sale was made.

In the view we take of this case, the competency, probative force or effect of the evidence need not be inquired into.

It is well settled law in this State that final judgments of probate courts in matters within their jurisdiction are as conclusive as those of courts of general jurisdiction. [Camden v. Pain, 91 Mo. 117, and cases cited; Rowden v. Brown, 91 Mo. 429; Price v. Springfield, R. E. Ass'n, 101 Mo. 107; Sherwood v. Baker, 105 Mo. 472; Macey v. Stark, 116 Mo. 481; Rogers v. Johnson, 125 Mo. 202; Cox v. Boyce, 152 Mo. 576.]

The order approving the sale of the real estate in question was a final judgment of the probate court, impervious to collateral attack, and subject to impeachment in a direct proceeding for that purpose only, for defects apparent upon the face of the record, going to the jurisdiction of the court, or for fraud. [Cases, *supra*.] So far as the face of the record of the probate court is disclosed by the evidence in this case nothing appears impugning the jurisdiction of the court in the premises, and any errors it may have made in the allowance of demands against the estate or in making the order of sale of the real estate, were merged in the judgment and are no longer the subject of judicial inquiry, except in so far as they may shed light upon the inquiry as to whether the judgment was procured by fraud. It it also well settled law, that a court of equity will not vacate

a judgment merely because it is founded upon a cause of action vitiated by fraud. The fraud to authorize relief against the judgment must have been committed in procuring it. [Payne v. O'Shea, 84 Mo. 129; Murphy v. De France, 101 Mo. 151; Nichols v. Stevens, 123 Mo. 96; Moody v. Peyton, 135 Mo. 482.]

There is no evidence in this case tending to prove either that the order of sale, or the approval thereof, was procured by fraud. For aught that appears to the contrary, all the parties to the transaction acted in perfect good faith, believing at the time that they were doing right, and proceeding lawfully in the premises, and intending only so to do. That error may have been committed, in allowing some demands against the estate, and in including them in the order of sale for payment, can not of itself furnish sufficient ground for annulling the sale. This possibility is all that the judgment of the circuit court has to rest upon. It is too frail to support it, and the judgment must be reversed. It is accordingly so ordered.

All concur.