H. Sam Jones v. L. P. Peterson, Guardian and Curator of Millard Redman and Woodrow Redman, Minors, Millard Redman and Woodrow Redman, Appellants.—72 S. W. (2d) 76.

Division Two, May 17, 1934.

*McKay & Peal* for appellants.

244

*W. G. Gray* and *McKay & McKay* for respondent.

LEEDY, J.—This is a suit in equity, originating in the Circuit Court of Dunklin County, whereby plaintiff seeks to rescind an alleged contract entered into between himself and defendant guardian and curator, and to set aside and cancel a guardian's deed from the latter to the former, conveying the undivided two-fifths interest of his wards in eighty acres of real estate in said county, which was executed and delivered in pursuance of the aforesaid contract. Upon a trial in the Cape Girardeau Court of Common Pleas, to which the cause was

awarded on change of venue, a decree in favor of plaintiff was entered and defendants have appealed.

The pertinent allegations of plaintiff's bill are (summarized) as follows: After alleging the derivation of the undivided two-fifths interest of the minor defendants in the real estate in controversy as by inheritance from their deceased parents, J. S. Redman and Mary E. Redman, the bill avers that said minors also owned an undivided two-fifths interest "in whatever personal property remains undisposed of in the hands of C. C. Redman, administrator of the estate of both J. S. Redman and Mary E. Redman . . . *the amount of which cannot be set out herein because the amount is unknown to this plaintiff.*" That in 1929, and prior to the negotiations which gave rise to this suit, plaintiff became the owner of the remaining three-fifths interest in the real estate and personal property in controversy by purchase from the brothers and sisters of the minor defendants; that plaintiff "also purchased from L. P. Peterson, Guardian and Curator of Millard Redman and Woodrow Redman, all of the undivided two-fifths interest in and to the above-described real estate belonging to them as well as the two-fifths undivided interest in and to all personal property undisposed of in the hands of C. C. Redman, Administrator of the estate of both J. S. Redman and Mary E. Redman, deceased, and agreed to give therefor as full consideration, the sum of $1200.00; that said L. P. Peterson, guardian as aforesaid, agreed to execute, to the Probate Court, a proper Guardian's deed conveying all of the undivided two-fifths interest of Millard Redman and Woodrow Redman in and to the above-described real estate to this plaintiff, and also agreed to assign to plaintiff the undivided two-fifths interest of Millard Redman and Woodrow Redman of, in and to whatever personal property remained undisposed of in the hands of C. C. Redman, Administrator as aforesaid, and to execute whatever papers were necessary to convey the said undivided two-fifths interest as aforesaid to the plaintiff for the consideration of the said sum of $1200.00, which said sum has been duly paid to said L. P. Peterson, Guardian and Curator of Millard Redman and Woodrow Redman as aforesaid."

The bill then alleges the execution and delivery of a guardian's deed conveying to the plaintiff the two-fifths interest of the minor defendants in and to the real estate in controversy, and that defendant Peterson, guardian and curator, "failed and refused, and now still fails and refuses to keep and perform said agreement, to assign to this plaintiff the two-fifths undivided interest of, in and to the personal property remaining undisposed of in the hands of C. C. Redman, Administrator of the estates of both J. S. Redman and Mary E. Redman as aforesaid." A demand on said guardian and curator to keep his said contract and agreement relating to said personalty and his failure and refusal so to do is next alleged, which

is followed by an averment that plaintiff has offered to execute to the guardian and curator a quitclaim deed to the interest in the real estate which was conveyed to him under the aforesaid guardian's deed, "placing said guardian and curator in the same position he was in before said Guardian's deed was made, and requested a return of his money;" that said guardian and curator refused to comply with such request and will not return said sum of money, nor comply with his agreement to assign to the plaintiff the aforesaid "two-fifths interest of, in and to whatever personal property remains undisposed of in the hands of C. C. Redman, Administrator of the estates of both J. S. Redman and Mary E. Redman, deceased; that the $1200 paid said guardian and curator was a consideration for the conveyance of both the real and personal property, and plaintiff therefore has been defrauded out of his money and property by virtue of said guardian and curator failing to keep and perform his agreement as assign said two-fifths interest in said personal property." It is further alleged the plaintiff is without legal remedy and will be irreparably injured unless given the relief prayed for herein. The prayer is for the cancellation of the guardian's deed and that said guardian be ordered and directed to return to plaintiff the said sum of $1200, and that the guardian be required to pay the sum of $67.67, representing the expenses incurred by plaintiff in procuring the guardian's deed, and for general relief. The answer, after making certain formal admissions respecting the appointment of defendant, Peterson, as guardian and curator for the minor defendants, and other matters, not necessary to be here noticed, "admits the death and heirship of Mary E. Redman as alleged in said petition, admits the defendant sold to plaintiff all of their right, title, interest and estate by order of the Probate Court of Dunklin County, Missouri, to the plaintiff herein, being two-fifths undivided interest in and to the Northwest quarter of the Northwest quarter and the Northwest quarter of the Northeast quarter of Section 14, in Township 19 north, Range 9 east; in Dunklin County, Missouri, but deny each and every other allegation, averment and statement in said petition stated and contained."

J. S. Redman, the father of the minor defendants, died intestate February 1, 1923, leaving surviving him, his widow, Mary E. Redman, and their six children as his heirs-at-law, namely: Arthur, Claud, Ethel, Opal, Millard and Woodrow Redman. The widow, Mary E., died intestate on the — day of June, 1924, leaving surviving her, as her sole heirs-at-law, the children above mentioned, except Arthur, who predeceased his mother, and who left as his sole heirs-at-law, his mother and the five brothers and sisters above referred to. One C. C. Redman was appointed administrator of the estate of J. S. Redman, and he served in a like capacity in the estate of Mary E. Redman.

On behalf of plaintiff evidence was introduced which tended to show that in 1929, plaintiff acquired from the two sisters and brother of Millard and Woodrow Redman (all adults), their respective interests (being in all an undivided three-fifths) in both the real and personal property of which their mother died seized and possessed, the consideration for such shares or interests being $500 each, or a total of $1500. It appears that Peterson had assisted the plaintiff in consummating the transactions whereby such interests or shares were acquired by the latter. It was also shown that during the summer or fall of 1929 there had been negotiations between Peterson and the plaintiff looking toward a sale of the minors' interests in the real estate, and perhaps the personal property, but they had been unable to agree upon a price therefor.

The plaintiff contended that their agreement was made at his office in Senath; whereas, the defendant asserted it was made on the front porch of his residence at or near Portageville. Evidence, pro and con, was heard on the question as to where the contract was made, as well as the subject-matter thereof, and what was embraced therein. The plaintiff and his witnesses on the subject testified that the interest of the wards in the personal estate of their deceased mother, then in process of administration in the Probate Court of Dunklin County, was included. On the other hand, defendant, who was corroborated by his witnesses, denied that anything except the real estate was agreed to be sold. In any event, a guardian's deed, conveying the undivided two-fifths interest of the minors in the real estate in question was executed and delivered by the guardian to the plaintiff, and by the latter accepted. This was done under proceedings in the probate court, the exact nature of which is not disclosed by the record:

The plaintiff testified that in the fall of 1929, and after certain unsuccessful attempts to agree upon terms, Peterson called on him at his office in Senath, when and where the following occurred: "He (Peterson) talked to me about the trade and I just told him 'In order to expedite matters, I will give you Twelve Hundred Dollars *for your interest in the estate;* I need the money that the administrator has, I will give you Twelve Hundred Dollars just to expedite matters'—so that I might get it from the administrator. Mr. Bray has an office adjoining mine. We called him in—he was already in the case, he helped me in getting the other shares; called him in the office and stated to him what we had done. . . . In a few days we went over to Mr. Peterson's house; went down in the cotton patch to the cotton wagon where he was, and the trade there was finally made. Mr. Peterson stated there he didn't want to be out any attorney fee; that he wanted Twelve Hundred Dollars clear, and that he didn't want to be out any attorney fee. I told him that Mr. Bray was already in the case; that we would fix the papers and he

wouldn't be out any attorney fee whatever. *I bought two shares of Woodrow Redman and Millard Redman. Their undivided interest in the estate.* I think Mr. Peterson stated on one occasion, or suggested that he sell me the real estate—him keep the personal property.

"The Court: You bought what now? A. All the interest that Woodrow Redman and Millard Redman had in the estate of Mary E. Redman, deceased.

"The Court: Woodrow and who else? A. Millard.

"Mr. John T. McKay: Q. Was that the oral agreement? A. Yes, sir."

In connection with the transaction, plaintiff further testified as follows:

"Q. Tell the court if following that there was anything done with reference to the real estate? A. We had a deed—Mr. Bray prepared a deed—we took it over there and the application and order for sale; something like that—Mr. Peterson signed that, too..

"Mr. B. A. McKay: That wouldn't be the best evidence of any sale made of real estate in the Probate Court.

"I have the deed here. We agreed upon a date to meet in Kennett to finally close the affairs. We did meet in Kennett at the Probate Court and got the papers necessary; the court appointed three appraisers to appraise the real estate that day. Mr. Peterson and I went in my car over to Mr. E. G. Overall's home—he was one of the appraisers—we stated there the agreement we had and told him we wanted him and two others to appraise the land. . . .

"Q. What was said that day (when the guardian's deed was made and delivered) with reference to the conveyance of the personal property? A. After the signing of the deed I told Mr. Peterson I would pay him for the entire amount at that time, and that we would prepare the papers for him to sign conveying the personal property to me. After that we went out into the court yard, Mr. Peterson and I. No, sir; no one else was with me; just we two were standing there in the court yard. Mr. Peterson had stated all through the conversation that he hadn't been treated right by the administrator and others in the estate; that he wanted to wash his hands clean of the whole affair. He said, 'This twelve hundred dollars is all I ever expect to get out of this; my expense over here is all I want.' He said if he could help in any way in bringing about a settlement, he would. He made it clear that that twelve hundred dollars was all he ever expected to get."

He further testified that Peterson thereafter refused to take any steps to convey the interest in the personalty, and upon his declining to return the purchase price, on tender of a deed, this suit was filed.

On cross-examination the plaintiff testified that the consideration recited in the guardian's deed was $1200, but that such recital was in fact erroneous because "that is what I paid for their interest

in the estate." He further testified on cross-examination as follows: "I never did determine the value of the real estate. I don't know what value there is on the personal estate, it was all considered as one. I didn't know anything about the value of the personal estate.

"Q. What was your idea as to the value of the personal estate? A. My idea was that the administrator had not made true annual settlements and there would probably be some equity there that was not shown.

"Q. You are complaining now that you got defeated in a deal and you don't have any idea what the value of the real estate or the personal property was that you were buying? A. I considered the entire interest worth around Twelve Hundred Dollars, yes, sir. There was eighty acres of land and whatever personal property there was, was in the hands of the administrator. I would say that eighty acres of land worth Two Thousand Dollars. . . . I had seen the last settlement the administrator had made. Yes, I knew that that showed a balance on hand of Twenty-seven Hundred Dollars. Let me explain. There was something over Thirteen Hundred Dollars of the administrator's money that went down in the Citizens Saving Bank. . . . I saw the last settlement made there.

"Q. You say you thought the administrator had failed to account for all he should have accounted for, which would increase that balance? A. I was taking a chance at that.

"Q. *At the time you put this land deal through the Court, why didn't you also put this deal through and let the court know you were buying the children's undivided interest in the personal estate?* A. *I don't know.* Mr. Bray prepared the papers. *We thought the way we were doing it was the better way.* I was there at the time.

"Q. And you tell the Court you were buying the personal estate, yet you paid the full price upon the delivery of the deed, without getting anything to show you had bought the personal estate. A. I didn't need any in people I had as much confidence in as I had in Mr. Peterson. He wanted the money. In fact, we first agreed on an installment settlement, I was to pay $400.00 down, $400.00 in six months and $400.00 in twelve months. This deal was made in my office. The trade was made in my office in Senath."

On plaintiff's re-direct examination he testified that at the time the real estate was sold under the order of the probate court, there was an understanding that Peterson, the guardian, would file and have allowed a demand against the estate of the minors for $1200, representing the amount due Peterson "for keeping the minor children for five or six years" and as part of the transaction, such claim should be assigned to the plaintiff Jones; that this plan was suggested by Peterson so as to relieve him of any liability on his bond in connection with the sale. On further cross-examination touching such arrangement, the following occurred: "Didn't you state that

you had some arrangement by which he (Peterson) was going to make a claim against the estate? A. *That was the way I was to get the personal property.* Yes, sir, Mr. Peterson agreed that I (he?) would make a claim against the estate of the minor children and get that allowed."

W. G. Bray, an attorney, called on the part of the plaintiff testified that he was called from his office by Jones, who introduced him to Peterson, and "Mr. Jones stated what the deal was that they were making. Then I asked Mr. Peterson if he was selling a two-fifths interest in eighty acres of land to Mr. Jones, and also was selling a two-fifths interest in the undivided personal estate, if any. He said he was. At that time he asked me to prepare an order of sale for the personal interest of the two minors, and also an order of sale of the real estate—two-fifths interest in eighty acres. . . . He asked me to prepare a claim against the interest of the two minors in the personal property, setting up that they owed so much to him for board, for so many months each year, and he allowed them so much per month for work during vacation. I prepared that bill for him, and also prepared an order of sale for the personal property." The witness further testified that he accompanied Mr. Jones to New Madrid County when the documents he had prepared were presented to Mr. Peterson in a cotton field where the same were signed. He did not know what became of the papers after they were signed; that they were delivered to Mr. Peterson. The witness did not appear as an attorney for either of the parties in the probate court.

The witness E. C. Overall, testified that he was one of the appraisers appointed by the probate court to appraise the land in controversy; that Jones and Peterson "drove up to my house in a sprinkling rain, called me out—I think Mr. Jones called me, I had met him before, he knew where I lived—he come and told me he was buying out the entire Redman estate, was giving him Twelve Hundred Dollars for the entire estate and he wanted me to go with him to appraise the land. He said the deal was made and it didn't make no difference what we appraised the land at. I got in the car, drove to White Oak, on the way Peterson mentioned it two or three times that he wanted to sell the entire estate, said he wanted to get real estate close to him where he could see after the property. . . . It seemed like the personal property was the main thing Mr. Jones wanted to get hold of." The east forty acres was appraised at $25 per acre, and west forty acres at $40 per acre.

Defendant Peterson testified, as set up in his answer, that he sold only the interest of his wards in the real estate; that the deal was made "in the middle of October, 1929" on the front porch of his home, to which plaintiff had come accompanied by a lady who sat in the car; that he was paying off cotton pickers at the time, and

there were perhaps six or eight persons present besides his family; that while the personal estate was discussed, ''There was nothing said there with reference to selling him the interest in the personal estate.'' In that connection his testimony was: ''The contract between Mr. Jones and I was that he was to give me Twelve Hundred Dollars. We first spoke of Eight Hundred Dollars, I told him that those two boys was the youngest children; that there had been 160 acres of land disposed of; that the other land had been gobbled up; that they would be entitled to two-fifths interest and that I would take Twelve Hundred Dollars for two-fifths interest in eighty acres. We talked about the personal estate. I asked Mr. Jones if there would be anything in the personal estate and he said, 'scarcely anything,' said it might be a long, continued lawsuit and maybe finally get One Hundred or Two Hundred Dollars. I said, 'Well, then, Mr. Jones, would you be willing if I sell you this land, will you be willing to bear your three-fifths of the attorney fee to bring the matter to a final settlement and get possession of the personal estate?' He agreed he would do it.''

He further testified that thereafter Mr. Bray and plaintiff brought him a petition for the sale of the real estate, which he signed, and three or four days later he was present in the Probate Court of Dunklin County ''At the time I made the deed and executed it. I delivered the deed to the Probate Court. I signed it in the presence of the Probate Court, he gave me a check for Twelve Hundred Dollars. . . . There was nothing said there about my conveying any interest in the personal estate of the children.

''Q. When did you first learn he was wanting you to do that? A. A short time after we had closed the deal. I walked out of the east side of the courthouse, he come out and said he would get up the balance of the papers, I could sign them and we would send them back and we would be through. It surprised me, I asked him what papers. It kinda excited me, I got nervous and was afraid that there was something wrong. I made the remark to him, I said, 'If there is anything lacking that might be just and fair, I will be perfectly willing to do it, fix them up and send them over.' I received some papers. A paper having to do with the personal estate. It was there I had charged these minor children doctor bills, clothes, various things. I did not execute that instrument. I certainly did notify Mr. Bray and Mr. Jones I would not make any charge against those minor children. After that Mr. Jones came to see me.

''Q. Did he explain why he wanted you to present a claim and have it allowed against the estate? A. No, he didn't make any explanation, said there was a misunderstanding and he would like to quit claim the land back to me and me give him the Twelve Hundred Dollars back.''

On cross-examination he denied being present and having the

conversation in Mr. Jones' office testified to by the plaintiff and Mr. Bray, and likewise denied requesting the preparation of the documents detailed by Mr. Bray.

Witnesses Joe Abercrombie and Jesse Abercrombie, testified to having been at the Peterson home at the time Peterson insists the agreement in controversy was entered into, and both of such witnesses corroborated defendant Peterson, in relation to what property was to be conveyed—i. e., the realty. Defendant Millard Redman, also took the stand and testified to the conversation between Mr. Jones and his uncle, the guardian, and that "My uncle told him we was minors and there was nothing against our land like it was the others, and ours should be worth more, he told him he would take Twelve Hundred Dollars for the land, Mr. Jones told him he would give him Twelve Hundred Dollars, beings he owned the other three-fifths." ·

The defendant offered in evidence a certified copy of the settlement of C. C. Redman, administrator of the estate of Mary E. Redman, which was subscribed and sworn to on February 11, 1928, which, as stated by counsel, was "for the purpose of showing balance on hand in the hands of the administrator of $2733.23." The settlement is not set out or called for in the bill of exceptions, but appellant, in abstracting the record makes this recital, "No point is made as to the formality of this settlement and for that reason the same is not set out herein."

As stated, the finding and decree below was for plaintiff, wherein it was recited:

"The Court further finds that Mary E. Redman died seized and possessed of the following described real estate lying, being and situate in the County of Dunklin and State of Missouri and described as follows; to-wit: (here follows description); that she also died seized and possessed of personal property now in the hands of C. C. Redman, Administrator of the Estate of Mary E. Redman, deceased.

"The Court further finds that Millard Redman and Woodrow Redman, on the date of the death of their mother, Mary E. Redman, owned an undivided two-fifths interest of, in and to the above described real estate, as well as an undivided two-fifths interest in all personal property remaining undisposed of in the hands of C. C. Redman, Administrator of the Estate of Mary E. Redman, deceased.

"The Court further finds that during the year 1929 plaintiff in this cause purchased all the right, title and interest of, in and to the above described real estate from L. P. Peterson, Guardian and Curator of Millard Redman and Woodrow Redman, belonging to them, and also purchased the undivided two-fifths interest in all personal property undisposed of in the hands of C. C. Redman, Administrator of the estate of Mary E. Redman, deceased, that the

purchase price of the undivided two-fifths interest in both the real and personal property, as aforesaid, was the sum of $1200.00.''

The relief afforded by that decree is in the alternative. The following is the concluding paragraph:

''It is therefore, ordered, considered and adjudged by the Court that the plaintiff have of and recover from the defendant, L. P. Peterson, Guardian and Curator of Millard Redman and Woodrow Redman, and from Millard Redman and Woodrow Redman, personally, the sum of $1200.00 with 8% interest from November 7, 1929, the date of demand by plaintiff, and all costs in this behalf expended, within twenty days from the 22nd day of January, 1931, and upon the payment of said sum with all costs, the Guardian's deed made by the said L. P. Peterson, Guardian and Curator for Millard Redman and Woodrow Redman, on the 7th day of November, 1929, and recorded in Deed Record 97 at page 362 of the land Records of Dunklin County, Missouri, be canceled, set aside and for naught held; that if the said Guardian and Curator fails or refuses to make said payment within the time herein fixed by the Court, the said Guardian's deed executed, delivered and recorded, as aforesaid, shall be and remain in full force and effect, and the said Guardian and Curator of Millard Redman and Woodrow Redman, as such, and the said minors, Millard Redman and Woodrow Redman, be and they each are forever barred, enjoined and restrained from setting up, asserting or making claim to any right, title or interest of, in and to any and all personal property belonging to the estate of Mary E. Redman, deceased, and title in and to said two-fifths interest in all personal property now in the hands of C. C. Redman, Administrator of the Estate of Mary E. Redman, belonging to Millard Redman and Woodrow Redman, shall vest in plaintiff herein as fully as if conveyed by said Guardian and Curator, and the costs of this proceeding are taxed against defendants.''

I. It appears that defendants filed an affidavit praying for the allowance of an appeal to this court, but the court below granted the appeal to the St. Louis Court of Appeals, and that court, on motion, transferred the case here because involving title to real estate. The right to cancellation of a deed to real estate is one of the issues—indeed, it is the principal issue in the case—and the judgment sought by plaintiff, and rendered by the court will operate directly upon the title, taking it from one litigant and giving it to another, so we think it clear that title to real estate, in the constitutional sense, is involved, and the appeal is properly lodged here. [Art. 6, sec. 12, Constitution of Missouri; Nettleton Bank v. McGaughey's Estate, 318 Mo. 948, 2 S. W. (2d) 771.]

II. As will be seen from the excerpts hereinabove set out,

the testimony adduced by both parties touching the conversations re-, specting the subject-matter of the prospective sale is wholly lacking in that degree of clarity and exactness which should attend an inquiry into transactions of the kind now under scrutiny. The record before us is partly in narrative form, and partly in the conventional question-and-answer style, though apparently greatly abbreviated, so that we are unable, in most instances, to determine the precise questions propounded by counsel. However, each side seems to have been content with the form of the questions framed by his adversary, as well as the answers elicited thereby. In a great many instances the latter were merely conclusions of fact or of law, or both. To illustrate: The plaintiff testified, "I *bought* two shares of Woodrow Redman and Millard Redman—*their undivided interest in the estate*." And in reply to the following question, "You *bought* what now?" the witness made this answer: "All the interest that Woodrow Redman and Millard Redman had in the estate of Mary E. Redman, deceased." On the other hand, defendant Peterson, instead of detailing his *conversation* with the plaintiff so that the court below (and this court on appeal) might determine therefrom its legal effect, testified, "*The contract* between Mr. Jones and I was that he was to give me $1200.00, etc." Furthermore, on the merits, and wholly apart from the other questions which we think are determinative of the case, the record is devoid of certain proof which we deem essential, and altogether too much is left to conjecture and surmise. In that connection it may be said that none of the steps taken in the probate court to effectuate the sale of the land were shown by the records of that court. The guardian's deed itself, although offered in evidence, is not even attempted to be presented for our review. We must indulge the presumption that a petition for an order of sale was filed, and such an order made, because it is conceded by the parties that the *form* of the deed was regular, and, by force of the statute, such a deed is required to refer, "in apt and appropriate terms *to the order of court*, the advertisement, the appraisement and description of the real estate, the time, place and terms of sale, and the payment of the purchase money, which recital shall be prima facie evidence of the facts so recited." [Sec. 408, R. S. 1929, sec. 408, Mo. St. Ann., p. 259.]

III. Appellants set out under their "Assignments of Error" six separate grounds for reversal, but no citations of authorities are made in support of most of them, and will be treated as abandoned. As stated in their brief, they rely mainly on two propositions: First, that the proof will not sustain an action for rescission because "the only excuse pleaded or attempted to be proven for such rescission is that appellants promised to assign respondent all of the undivided interest of Millard and Woodrow Redman in the hands of the admin-

istrator of Mary E. Redman, deceased, which was cash in the hands of said administrator." And, second, "that plaintiff is not entitled to equitable relief for the reason that he comes into equity with unclean hands." The four cases cited by appellants in support of the first proposition are merely declaratory of the familiar doctrine that, in fraud cases, a promise to do something in the future, though made without intention to fulfill it, is not a misrepresentation of an existing fact, and, therefore, not actionable. ■ Manifestly that rule is not here involved, because this is not a fraud case; that is, the action is not predicated upon fraud alleged to have been practiced in the procurement of the contract. The basis of plaintiff's action, we think clear, arises from a default in its performance, and the cases relied on are without application. The second proposition urged by appellants grows out of the proof that there was an understanding that Peterson would make and have allowed a demand against the estate of his wards for $1200 (being the same amount he received in this transaction) for their board and lodging for a period of five or six years, and assign the same to plaintiff. While recognizing it is a cardinal maxim of equity that he who seeks equity must come into court with clean hands, in the view we take of the case we deem it unnecessary to burden this opinion with a discussion of the applicability of that doctrine to the facts before us.

■ IV. It is a rule of practice that on appeal in equity cases, this court reviews the whole evidence in order that we may weigh and decide *de novo,* and thereby do equity; and to that end, this court is not bound by the findings of the chancellor, but will make its own findings of fact and of law, and, if necessary, enter a judgment appropriate thereto. [Noell v. Remmert, 326 Mo. 148, 30 S. W. (2d) 1009; Neville v. D'Oench, 327 Mo. 34, 34 S. W. (2d) 491.] If our disposition of the case depended on a determination of a close question of fact, on conflicting evidence, we would on this record defer to the chancellor's findings of fact because of his better opportunity to judge the credibility of the witnesses, and affirm the judgment. But such is not the situation here, because it is obvious that the learned chancellor made and applied certain findings of law which we think palpably erroneous, and cannot be sustained under the record. ■ One of the findings referred to is "that Millard Redman and Woodrow Redman, *on the date of the death of their mother,* Mary E. Redman, owned an undivided two-fifths interest in all personal property remaining undisposed of in the hands of C. C. Redman, administrator of the estate of Mary E. Redman, deceased." As said by Judge LAMM, in Seilert v. McAnally, 223 Mo. 505, l. c. 515, 122 S. W. 1064, l. c. 1066, "It is primer law that the title to personal property of one dying intestate passes to his administrator. . . . But the title to real estate vests directly in the heir." We

hold that the title to the personalty involved in this controversy did not vest in the minor defendants on the death of their mother, as the court below held, but passed to her administrator. The record is barren of any proof that an order of distribution, either before or after the date of the contract in question, had been made in the estate of Mary E. Redman, and in the absence of such an order, her heirs had no interest in or title to her personalty. [Darr v. Thomas, 127 Mo. App. 1, 106 S. W. 95; Smith v. Denny, 37 Mo. 20.] ■ And moreover, we think if there had been such an order of distribution, and the property remaining in the hands of the administrator consisted of money, as the proof here indicates it was, in the absence of some special showing, the probate court itself would have been without power or authority to make such an order of sale, because the sale of money, as such, is not comprehended by the statute authorizing the sale of the personal property of an infant. [Sec. 410, R. S. 1929, sec. 410, Mo. St. Ann., p. 260.]

■ V. The plaintiff alleged the delivery to him of the guardian's deed, the form of which is conceded to be regular, and no complaint is made respecting the character of title conveyed thereby, nor of the proceedings in the probate court. We shall, therefore, indulge the presumption of right acting on the part of that court, including compliance with the statute providing for the report and approval of sales of real estate by guardians and curators. [Sec. 407, R. S. 1929, sec. 407, Mo. St. Ann., p. 258.] That section requires the guardian or curator to "report such sale to the court ordering the sale in the same manner as executors and administrators are then required by law to report sales of real estate made by them for the payment of debts; and such sale, if approved by said court *shall be valid to all intents and purposes.*" It further provides that the report of sale "shall be and remain on file ten days before being acted upon by the court." As said by Judge GANTT, in Blickensderffer v. Hanna, 231 Mo. 93, l. c. 109, 132 S. W. 678, "On this point, it must be constantly kept in view that this was a judicial sale, and the principles governing that character of sale must govern. It is familiar law that, in a judicial sale, the court ordering and approving the sale is regarded as the contracting party on one side, and the bidder on the other." We think the binding effect of the order of the probate court approving the sale presents an insurmountable obstacle to plaintiff's right of recovery. What was said by this court in Covington v. Chamblin, 156 Mo. 574, l. c. 587-88, 57 S. W. 728, and approved as recently as Scanland v. Walters, 324 Mo. 1084, 26 S. W. (2d) 603, l. c. 608, would seem to dispose of the case. It was there held: "The order approving the sale of the real estate in question was a final judgment of the probate court, impervious to collateral attack, and subject to impeachment, in a

direct proceeding for that purpose only, for defects apparent upon the face of the record, going to the jurisdiction of the court, or for fraud. . . . So far as the face of the record of the probate court is disclosed by the evidence in this case, nothing appears impugning the jurisdiction of the court in the premises, and any errors it may have made in the allowance of demands against the estate, or in making the order of sale of the real estate, were merged in the judgment and are no longer the subject of judicial inquiry, except in so far as they may shed light upon the inquiry as to whether the judgment was procured by fraud. . . . There is no evidence in this case tending to prove that the order of sale, or the approval thereof, was procured by fraud.'' ▮ As probate courts are established by organic law, the Constitution of Missouri, their judgments are entitled to the same credit and presumptions accorded to courts of general jurisdiction. [Robbins v. Boulware, 190 Mo. 33, l. c. 43, 88 S. W. 674.]

An interesting discussion of at least one mode of redress open to a purchaser at a judicial sale is contained in the opinion in Stanton v. Johnson's Estate, 177 Mo. App. 54, 163 S. W. 296, which was a case wherein plaintiff attended a guardian's sale of personal property, held at auction, and purchased a pair of mules for $500 on the guardian's warranty that they were sound. Shortly thereafter it was discovered that one of them was worthless, and plaintiff presented his claim to the probate court asking to return the mules and that the purchase money be paid back to him. The point was made that plaintiff's case was one in equity, and that as such the probate court had no jurisdiction. It was there held: ''While it is true that a probate court is not a court wherein a case purely in equity can be prosecuted, yet on matters where it has jurisdiction it may do justice by applying equitable principles, 'whatever the nature of the demand whether equitable or legal.' [Hammons v. Renfrow, 84 Mo. 332, 340; Hoffman v. Hoffman, 126 Mo. 486; Fisher v. Clopton, 110 Mo. App. 663.] And when one goes into any other court with his grievance he must be ready to give the most explicit and clear reason for having passed by the probate court. [French v. Stratton, 79 Mo. 560.]

''Here was a wrong perpetrated by an agency of the probate court, viz., a guardian making a sale under its order and supervision; what more appropriate place could be found to right the wrong? If plaintiff had sought relief in the circuit court, would he not have been called upon to explain why he had not appealed to the probate court, which had entire control of the matter?

''But there is another view in this connection which is equally destructive of defendant's point. The sale was made under the order and command of the probate court. Its order was the guardian's warrant of authority and may be likened to a writ of execu-

tion or an order of sale in partition from the circuit court in the hands of a sheriff. Of the latter it was ruled that 'It is the undoubted duty of every court to see that its process is not abused and perverted to the oppression of individuals. At the return day of process, courts will see that it has not been executed in an illegal or oppressive way and will give summary redress.' [Ray v. Stobbs, 28 Mo. 35.] 'There is scarcely any fraud . . . in the execution of a writ which may not be made the occasion for a motion to vacate a sale.' [McKee v. Logan, 82 Mo. 524; City of Aurora v. Lindsay, 146 Mo. 509, 515.] These cases have lately been fully approved (State ex rel. v. Wessell, 237 Mo. 593), and have been followed by the St. Louis Court of Appeals in Finke v. Craig, 57 Mo. App. 393; Bank v. Terrell, 135 Mo. App. 472; State ex rel. v. Innes, 137 Mo. App. 420.''

VI. We have given some consideration to the question of the contractural powers and liabilities of guardians, and while not deciding the case on the point, we entertain grave doubt as to plaintiff's right to maintain this action against Peterson in his representative capacity. It strikes us his liability, if any, is personal, and not as guardian and curator. A curator does not stand in the same relation to the estate of which he has charge as does an administrator, who can sue and defend in his own name because of the title he has to the intestate's personal property, but in the case of an infant's estate, the title is in the infant alone, and not in the curator, and ''in all cases the ward is the party, and the curator is the representative; the act either in suing or defending is the act of the ward by his curator.'' [Judson v. Walker, 155 Mo. 166, 55 S. W. 1083.] It has been held that, ''Generally speaking, a guardian whether of a minor or of an incompetent has no authority whatever to bind either the person or the estate of his ward by contract.'' [Greever v. Barker, 316 Mo. 308, 289 S. W. 586.] And, ''On all contracts made by him for the benefit of his ward, he is personally and solely liable.'' [Rhodes v. Frazier's Estate (Mo. App.), 204 S. W. 547.] In that connection 12 Ruling Case Law, section 27, page 1128, says: ''The special care with which the law protects the interests of an infant prohibits his estate to be charged with liability, except on the guardian's accounting before the probate court, which holds the guardian's bond to protect the infant from loss, and which acts equitably and with full knowledge of the situation of the estate.''

VII. This brings us to the consideration of another proposition which is fundamental and obtrudes itself in any view that may be taken of the case. Obviously plaintiff's bill does not make this a suit bottomed on fraud in the procurement of a contract, but rather, as we have held in a preceding paragraph, arises from a

default in its performance. But it is not every default in the performance of a contract which gives the injured party an election either to bring an action for damages, or consider the contract as rescinded and recover back the money paid. The authorities hold that such an option or election exists where the contract is executory on the part of him who receives the money, and he altogether fails to fulfill his part of the contract. [6 R. C. L., p. 925, sec. 310; 13 C. J., p. 614, sec. 664.] Nor does the bill proceed on the theory of accident, surprise, mistake, duress, or any of the cases of the character to which the remedy of rescission is, as a general rule, restricted, but respondent takes the position, under point IV of the brief, that the contract is entire, and that its covenants to convey both the real and personal property in consideration of the payment of $1200 are mutual and dependent, and relies on the holding in Haydon v. Railroad Co., 117 Mo. App. 76, 93 S. W. 833, that in exceptional cases where there is such radical non-performance of mutual dependent covenants going to the very root and life of the contract as amounts to an abandonment of the contract, and releases the other party to further recognize its obligation the equitable remedy of rescission will be applied. The Haydon case, supra, finally reached this court on certification because one of the judges of the Court of Appeals deemed the majority opinion contrary to a previous decision of this court, and is reported in 222 Mo. 126, 121 S. W. 15. Adherence to the holding in that case, we think, necessitates an outright reversal of the judgment below. While expressly recognizing and giving approval to the doctrine contended for by respondent, it was held that the plaintiffs therein ''must stand or fall'' on what the writer of the opinion, Judge LAMM, termed a ''sensible limitation'' on that doctrine and which he quoted from 24 Am. & Eng. Ency Law (2 Ed.), page 619, as follows: ''A bill for rescission cannot ordinarily be maintained where the ground of relief is merely a breach of contract for which the complainant can obtain adequate compensation in an action at law. Courts of equity sometimes, however, exercise jurisdiction to rescind contracts upon the ground of a breach or non-performance by the defendant, in cases where the plaintiff's remedy at law would be inadequate.'' Measured by that limitation and general principles, it was held plaintiff's bill did not state a cause of action in equity. Here, as in the Haydon case, supra, there is an attempt to rescind the contract *in toto,* whether executed or executory, and to put the parties where they were at the start. But it was further held in that case that in the absence of fraud charged and proved the rescission of an executed contract is not equitable doctrine, but a rescission might go as to the part unperformed where there is a breach amounting to abandonment; but in that event the rescission would only relate back to the time when the defendant violated its covenants, and there was no

necessity for going into equity to rescind the contract for the plain reason that they may recover their damages, if any, in an action at law. [Haydon v. Railroad Co., supra, l. c. 142.] Furthermore, we cannot give our assent to the proposition that the contract is entire, and its covenants are mutual and dependent. We think, upon plaintiff's own showing, the contract is severable, and must be so held, as a matter of law, because the consideration for the real estate is a thing separate and apart from the consideration for the personal property. This is necessarily so because of the provisions of our statutes relating to appraisements under sales of real estate made by the probate court. Section 406 provides that: "In no case shall the same (the real estate of a minor) be sold for less than three-fourths of its appraised value;" and Section 407 says that "No such sale shall be approved by the court unless the property sold for not less than three-fourths of the appraised value thereof." Applicable statutory provisions are written into contracts by operation of law, and so we think it clear that plaintiff cannot be heard to say that the consideration passing for the real estate was less than three-fourths of its appraised value, and if that be true, the failure to perform as to the personal property does not go to the whole consideration. We think a suit at law for damages for non-performance in that particular is an adequate remedy, particularly in view of the fact that the bill contains no allegation that defendant, Peterson, is insolvent, or otherwise cannot be made to respond in damages.

From what has been said, it follows the judgment below must be, and it is hereby reversed, and the cause is remanded with directions to dismiss plaintiff's bill. *Tipton, J.,* concurs; *Ellison, P. J.,* absent.